Thank you. We'll announce our second case of this afternoon, number 19-2253. Geness v. Adm Office PA Courts et al., Mr. Petrogallo and Mr. Sansone. Mr. Petrogallo? Good afternoon. May it please the Court, I am Bill Petrogallo, and our law firm represents the AOPC, the Administrative Office of Pennsylvania, which is the administrative arm of the Pennsylvania Supreme Court. We thank you for this opportunity to amplify our brief with this oral argument. May I request two minutes for rebuttal? Not a problem. Thank you. By the way, are you having any trouble hearing me? None whatsoever. Okay. Someone suggested that my voice was muffled in the last oral argument. We're good. Thank you. To begin, I wish to very briefly convey three central points of our argument. First, Mr. Geness was not denied access to the services, programs, activities, and benefits of the Administrative Office of the Pennsylvania Courts in the manner suggested by him in the second amended complaint. Specifically, the AOPC did not, could not, and should not provide those services, programs, activities, and benefits. Second, despite his disability, Mr. Geness was not a qualified individual for purposes of the Americans with Disabilities Act. How was he not qualified? Two ways, thank you. First, you cannot ask for and receive multiple postponements for a hearing and a trial and then claim that you did not have the right to stand trial. You disqualify yourself by asking for a postponement. And the second reason is, having been found incompetent at the time, Mr. Geness would be ineligible because of his lack of competency to stand trial or to participate in any other hearing. So where the mandate is eligible, I think that he has disqualified himself through the conduct of his counsel in presenting his case and indeed his own mental disability. When you look at the first opinion in this case, it seems as if, and the court essentially said, at every turn, every single participant in this whole scenario was at fault, whether it be the judge, the Commonwealth, the counsel to Mr. Geness, everyone. Nobody is excluded. And so when a claim is brought against the Commonwealth for the ADA and due process, which it can be, at least by allowing an amended complaint, the Commonwealth says, it ain't me, it's got to be the AOPC or the Health and Human Services. And then when it comes to you, it says, it ain't us, it's got to be the Commonwealth or somebody else. I mean, it's like everybody is pointing fingers at everybody else. And this person, if he was truly incompetent, as you say he was, and in fact has been found to be, why did it take nine years plus of this kind of delay before there was even an attempt made to say, okay, there's nothing here. And then once you do say there's something here, the judge doesn't even buy that. He says, no, go ahead and just nullify it. Well, going back to the first portion of your question, the earlier decision of this court, Justice Judge Krause, I've read that opinion several times over and over, and no fewer than 12 times in that opinion does the judge criticize and take the task of the lawyers who are representing Mr. Geness for what they did and what they did not do. And the record in the Fayette County Court, which we asked you to have judicial notice of, and the record from the Second Amendment complaint, clearly demonstrates that the reason this case lingered was because that's what Mr. Geness's lawyers wanted or did. And there was no intrusion that would cause delay occasioned by the conduct of the AOPC. In our administrative role, we were not empowered to enter an appearance. We were not empowered to overrule the judge. The opportunity and indeed the process in Pennsylvania could and would have worked if their lawyers would have got off of their hands and filed timely motions. And by the way, those motions, if we look at the record, were timely answered by the court. Now maybe the court didn't answer them the way it would have favored Geness to be free from incarceration, but we don't ever know that because if he was competent and held for trial, he could have been convicted of homicide. We don't know what the strategy was. Let me ask you, isn't another way of looking at this case is that he did have access to the courts, took full advantage of access to the courts, and ultimately had a murder charge dismissed against him? Absolutely. I hope we made that point on brief, Your Honor, because that is in fact what happened. And yes, when you take a look at it in hindsight, it's regrettable what happened to Mr. Geness, but you cannot pin the rose on the lapel of the AOPC whose administrative functions don't go anywhere near intruding and intervening in the litigation, criminal litigation. Mr. Petragallo, let me go back to Judge Ambrose's question, though, because I think implicit in Judge Ambrose's question, as I understand it, and I share his concern, is that the prior opinion of the Third Circuit written by Judge Krause indicates a breakdown in the system here. It's not merely the fault of defense counsel. So if that's the case, I share Judge Ambrose's concern, and I'm asking you to assume this. I know you don't agree with it, but assume that the lapel needs to be pinned on someone. I share Judge Ambrose's concern that this is just a game of passing the buck among other people. So my question to you is, if not the AOPC, who should be responsible here, assuming that somebody is liable for the systemic breakdown? Well, unequivocally, the lawyers who represented him, two and three lawyers, who failed, utterly failed to move the case along, maybe that was their strategy. But the Pennsylvania Rules of Criminal Procedure gave them the opportunity to do so. The judges in Fayette County, when they presented motions, did indeed rule on them. The decisions that they made created, allowed for the extension. And by the way, in the early opinion of the court, you know, the AOPC was not a party. The AOPC is not the legal system in Pennsylvania. It is one with assigned administrative tasks to assist the system in working. And by the way, that system can and does work. The Rules of Criminal Procedure, the Mental Health Procedures Act, all prescribe how Mr. Janess could have been treated for a prompt trial under Rule 600 of the Criminal Procedure Rules, and secondarily, where he should have been housed when he was found to be mentally incapacitated for trial. So when you want to, look, I don't want to label the conduct of the Department of Human Services as a problem, but it wasn't the AOPC who had to place Mr. Janess in an appropriate medical setting. It was the Department of Human Services, and sadly, we don't have enough beds in Pennsylvania to house all these people, but that's where that buck stops. And so, yes, there's a lot of blame and a lot of fault, and I read that opinion carefully. Never once did that opinion say the administrative office of Pennsylvania should have done A, B, or C. No, but what the opinion does say is that, and Judge Kearney quotes it, that the multiple protracted and inexcusable delays in the handling of Janess's examinations, transfers, and motions, resulting in nearly a decade of imprisonment and civil commitment before a hearing was finally held on his safety's petition, are more than sufficient to state a claim under the ADA, close quote. You then say, well, he doesn't even qualify under the ADA. Well, our courts already ruled that there's an ADA violation and also a due process violation. Now the question is, as Judge Hardiman noted, who can you possibly pin that on? And it may be more than one party. We're not saying you'll necessarily lose. All we're saying is at the motion to dismiss stage, without a fully developed factual record, which the district court judge says he needs, might there not be a responsibility of the AOPC under its rules of judicial administration, at least 5051 and 5056, that may need to get vetted before a jury. 5051 says you have the duty, AOPC, of reviewing the operation and efficiency of the system and of all offices related to and serving the system, and when necessary, reporting to the Supreme Court or Judicial Council with respect thereto. And then six, examining the state of the dockets and practices and procedures of the courts and making recommendations for the expedition of litigation. And this is the other end of the spectrum of delay in terms of not having expedited litigation. That, in a nutshell, is their complaint. And at the motion to dismiss stage, which the judge is saying I need more information, why not just let it go? You may very well win in the end. And I'm very well aware of 505 of the rules of judicial administration, Sections 1 and 6, as mentioned by Judge Kearney. But what it doesn't say is what happens and how that, in a criminal case, an ongoing criminal case, could have any impact on what happens in an ongoing criminal case, any impact on what the judges in Fayette County might rule in response to a habeas corpus motion accompanied by a motion to postpone. And so where that failure in the pleading is just that, the nexus. Hang on, I think one of the judges has a question. I'm sorry. Yeah, quickly. I mean, the AOPC could bring this case to the attention of the Pennsylvania Supreme Court, correct? I suppose, yes. Well, yeah, they can. And the Supreme Court can get involved in any criminal case they deem appropriate. That never happened, right? The AOPC never brought it to the attention of the Pennsylvania Supreme Court. Is that correct? On the plea, right? Well, and I agree that could happen. That is a fact that is outside the record of the Second Amended Complaint. But let me respond to it otherwise. So, first of all, it's outside the record. But secondly, so what's the Supreme Court going to do when they get this? Are they going to say, well, Judge, in Fayette County, what was your reason? I want to take – and how do we know that the Supreme Court said, well, okay, it's a decision of that lawyer to file a motion to continue because it's his belief that by doing that he is best protecting his client. And then you've got the Supreme Court interceding not as a litigant, not as a proponent, but rather as a jurist. We already have jurists that are making decisions which didn't work for this man. But that wasn't the fault of the system. Did the AOPC monitor the docket and do any reporting on it? Well, there's an allegation they monitored the docket, and let's assume it's correct. But just the monitoring of the docket, and I might add, if it did that, what act would be triggered by them monitoring it? So if it was because there was too much time going on, we already have Rule 600 of the Rules of Criminal Procedure, which would give a lawyer the ability to pursue a speedy trial. Second, if there was an unresolved motion before the court, there were the rules that allow for the system to report that to the Judicial Administration, Judicial Conduct Board. There's things that they could have done that would have triggered it, but to what end? It would be right back to the lawyers and the judges to make decisions. But what does the AOPC have to do on its own? It supposedly is to monitor dockets for the purpose of expediting litigation. If at some point a case like this goes on seemingly forever, then you would think, okay, either they monitored the docket and didn't report up, or they didn't monitor the docket when they should have. And that sounds to me like something that gets us past a motion to dismiss, as Judge Kearney ruled. I beg to differ. First of all, the fact that they monitored the docket in compliance with Pennsylvania law and the Mental Health Procedures Act, a person charged with homicide can remain incarcerated for up to 10 years or longer based on that charge of homicide without being brought to trial. So on its face, monitoring the docket does not run afoul of Pennsylvania law. Now, if we superimpose on that that they know that he has a disability and that that disability somehow changes the law, which I don't think it does because I thought the law was even as to all, the purpose of the ADA was to make sure that there was equal application to that law. And so once they would have looked at this docket, they would have seen, no, this is inside the boundaries of the Mental Health Procedures Act. The problem is it was in the wrong, the man should have been in a different location, not their responsibility. Yes, I'm going to pass the buck on that one. And so when you ask the administrative office what they were doing, they did what they were assigned to do. But even if they did a monitoring and a review of the system, that doesn't create the necessary causal nexus between that conduct and anything that could have changed what went on for Mr. Gines. So you're in effect arguing that AOPC couldn't have done anything more for Mr. Gines? I am. Doesn't that go to the, go ahead, Tom, I'm sorry. You could have brought it to the attention of the Pennsylvania Supreme Court, and the Pennsylvania Supreme Court might have then, might have exercised its supervisory authority to pull Judge Leskinen from the case or otherwise intervene. But all of the decisions along those lines would have been the purview of the Pennsylvania Supreme Court, not the AOPC. That's your argument, as I understand it. That is one. That's precisely one of the arguments. So you've got this sort of bureaucratic advisory role, and you've got all of these assignments from the Pennsylvania Supreme Court. But in terms of true power, the AOPC is toothless. Is that what we're to understand? Yes, Your Honor. Would you allow this analogy? And I apologize. It is a sporting analogy. But to ask the AOPC to have acted in this case would be much like asking the scorekeeper or timekeeper at a ball game to put down the clock or put down the scorebook and get in the huddle and call and run the play. There's a disconnect in the role and the job. And it all goes to the issue of what the duty was of the AOPC. And the duty is only to monitor, not to act. Excuse me. If you want to take that analogy a little further, the scorekeeper does come into play at the end of a game. Does the shot get off in time in order to be counted, or does it not get off in time? And the scorekeeper here, who's in charge of monitoring the dockets, it looks as if the judge is saying, I'm not going to say you didn't do your job or you did do your job. I just need to have discovery to resolve what actually happened. And that seems to go to the merits. And why not let that happen, let that occur? Let's find out what the real facts are. As I said, you may win in the end. And I feel very confident that we can and should. But on the scorekeeper analogy, the scorekeeper doesn't make that call if the basket was scored before the ball went in. The referee, the official, the judge, makes that call. And that's what the judge is there for. That's what Judge Pierney is there for. But the call is not – he is the judge. And the judge is in Fayette County where the judges who are making the calls in this case and need to do so independent of the AOPC or any potential ex parte intrusion into the case. Why don't we hear from your opposing counsel and we'll get you back on rebuttal. Thank you. Good afternoon, Your Honor. Joel Santone on behalf of the appellee, Craig Janess. I want to start by saying this appeal that is before the court is about sovereign immunity only. It is not about the merits of the case. It is not about whose job it was to do this. It's about sovereign immunity. The defense here would have this court grant sovereign immunity to an instrumentality of the state where neither the state nor any of its instrumentalities have sovereign immunity because it's been validly abrogated by the passage of the ADA. So in this case, if you, Your Honor, were to rule that an agency of the state can get sovereign immunity when a state cannot, then the possibility that every agency of every state who is accused of failure to ensure compliance with the Americans with Disabilities Act would make a claim for sovereign immunity. That means that the abrogation of sovereign immunity by the Congress would be rendered meaningless. By the way, there is no case that we can find anywhere in American jurisprudence where an instrumentality of the state has been granted sovereign immunity. There has been no grant of sovereign immunity to any state under the ADA, let alone one of its agencies. I agree with Judge Charney in this case with respect to his ruling on this motion to dismiss. Judge Charney found, as did Judge Krause in the earlier opinion in this case, that both Georgia and Lane have ruled that sovereign immunity is validly abrogated as to the Americans with Disabilities Act. As the Lane Court observed, Section 131B of the Americans with Disabilities Act specifically includes agencies, departments, and instrumentalities of the state. And Judge Charney recognized that the AOPC is an arm of the state. And so therefore, all of this talk about whose job this was or why the AOPC should not be held liable for the failures in this case has nothing to do with sovereign immunity. It may have to do ultimately with liability. It may be a subject they want to raise on summary judgment. However, as you, of course, can see, we've shown many facts that are currently in the ongoing record, discovery is still ongoing in this case, and AOPC is participating in that discovery by a special grant from the lower court. And it may be that they want to raise a summary judgment that they're not liable for this. We've shown facts that show why they shouldn't even move for summary judgment, but they might want to. Let me ask a question on that because it sounds very broad. I think I understand your argument in saying that sovereign immunity is aggregated for ABA claims and you've got good authority to support that in Tennessee v. Lane. But the procedural posture of this case, if we accept everything that I just heard you say, would mean that when you amended your complaint, you could sue 50 instrumentalities of the Commonwealth of Pennsylvania and none of them would be able to get out of the case on a Rule 12 motion, and they'd all have to wait until summary judgment. And that just seems illogical to me. The Department of Health and the AOPC were not parties when this opinion was written by our court, authored by Judge Krause, correct? They were not parties at that time. That's correct. So once you added them after that opinion, isn't it axiomatic that they, whatever defendants you might have added, whether it was the two here or 50, each one of them would have at least an opportunity to follow the Rule 12 motion and say, you know, we don't know why we're in this case. I mean, there may be some aspect of the Commonwealth of Pennsylvania that has some instrumentality or the Commonwealth itself in its own name is liable, but that's not us. Are you saying that the AOPC has no right to make that argument? Not at all. They have the right, and they made that same argument, as could any instrumentality of the state. The one argument they can't make is sovereign immunity. They can claim lack of liability, and the court can act as a gatekeeper under Rule 12 to not, if there's no facts that would tie AOPC to this responsibility, then the court could have ruled, hey, you don't put any facts that draws AOPC into this. You're saying then that they should have defended with a failure to state a claim under 12b-6 rather than lack of jurisdiction under 12b-1? Right, which they did, and the court rejected that as well because the allegation set forth in the Second Amendment complaint set forth a claim that AOPC was responsible for this. All right, well, then that sort of gets us into the merits, and that's what I've been wrestling with the past few weeks is what's the duty here by AOPC? We have an adversary system. Is it your argument that if a defense lawyer seeks a series of continuances that result in an indicted client being incarcerated for three or five or eight years, that it's the duty of the AOPC to file a petition to intervene and say that the defense lawyer who has sought and obtained continuances is providing ineffective assistance of counsel or something like that? No, Your Honor. First, let me say that we've now left the question of sovereign immunity. We are now on the question of liability under the statute. We're not now talking about sovereign immunity. So I say that when they lost the question of sovereign immunity, this collateral appeal should not have been available. It's maybe something they wanted to re-raise on their ultimate appeal, but this isn't a question of sovereign immunity. It's a question of liability under the statute. Now, if you want me to turn to that argument, I gladly will, and as you saw in my brief, I did. First of all, AOPC, we've demonstrated, has a responsibility under Rule 505 of the Pennsylvania Rules of Judicial Administration not only to monitor the state of the dockets, but to review each case and come forward with suggestions or with recommendations as to how to expedite litigation. In this case, they undertook part of that duty. They went directly to Fayette County, to the court administrator there, and asked what the heck's going on? Why isn't this case moving? They apparently did that regularly with cases that didn't move. So they had direct contact. They knew exactly what the facts were. They undertook that duty for a reason. The reason they undertook that duty is because they knew it was their job to do it. The court administrator that we deposed in this case testified he has near daily access to the Chief Justice. Can we consider that deposition? If you're considering anything beyond the question of sovereign immunity, yes. If you're considering the merits of why AOPC is responsible for this, which I think should be delayed to a point in the case where it's appropriate, because it's not at this point, but if you're asking me should you be able to consider those, yes. They are a matter of the ongoing record in the lower court. They contradict the claims made by AOPC in their brief to you, that they don't have any responsibility to do this work. Answer this for me because I'm as confused as I think my colleagues might be. What specific right was violated in terms of services, programs, and activities that he was denied? What was he denied? The head of the AOPC and their first assistant both agreed that trial and the accoutrements of trial, which would be the motions on habeas corpus, they are services that are provided by the Pennsylvania courts. It's not just trials. In his case, he was called at the call of the list on a monthly basis. The judges didn't respond to whatever petitions were filed by defense counsel. So he had access to the courts. No, sir. No, sir. There have been four habeas corpus motions filed in this case. None of them have been ruled upon. None of them have been given a hearing. Judge Kennedy got it a little long in his opinion. He said that until a hearing was finally held on habeas corpus, there was no hearing on habeas corpus. There was a hearing in July of 2015 on whether he was competent to stand trial. Thereafter, the fourth motion for habeas corpus was filed, the first three having never been ruled upon. When the fourth motion was filed after the election when the DA lost his bid to be DA, the DA came forward and said that he'd be willing to no-appross the case. There was never a hearing on any of the allegations in all four of those motions for habeas corpus. So he did not have access to the court. He got something better than a trial. He got released without having to suffer a trial. It sounds like the injury you're complaining of is the delay that occurred when the Fayette County Court sat on those habeas corpus motions and didn't act on them. First of all, I want to put something else up. Just because a defense lawyer asks for a continuance doesn't mean a judge has to grant it. Let me just interrupt you there, Ms. Sansone. I couldn't agree with you more. You won't find somebody, and I think you probably remember this from the time that we had cases together when I was a trial judge. No one is more interested in efficient justice than I am because I've always believed that justice delayed is justice denied. But how can you argue that when a defense lawyer seeks a continuance and the judge chooses to grant it, that somehow the administrative office of the courts is supposed to get in the middle of that decision? That I find hard to fathom. You know, you judge, and I do remember you from the bench, and I do remember that I would suggest to you, if I had ever come to you and said, listen, I want an indefinite postponement in this case because my client is incompetent to stand trial, you would have looked at the law and said, that is not a basis for an indefinite continuance. That's correct. But sadly, there are other judges that run their dockets at a snail's pace, and unfortunately we in the appellate courts have to deal with that, whether it be a state judge or a federal judge. But who solves that problem? I think everyone on this call agrees that justice delayed is justice denied and that judges should work hard and they should manage their dockets appropriately. But in the rare occasions, in this case seems to be one of them perhaps, where the trial judge doesn't or the trial court doesn't measure up to standard, isn't that a job in the state system for the state Supreme Court or in the federal system, the U.S. Supreme Court, to manage that? It's a job for judges. It's not a job for bureaucrats that help judges run the courts. That's what I'm struggling with. How do I get from this being the duty of judges and courts and assign that duty and blame to a bureaucracy like the AOPC? Well, first of all, going back to the reason why the public defender moved for continuance was because the plaintiff was incompetent to stand trial. It wasn't for some other reason. Secondly, and parenthetically, by the way, this case was null crossed by the district attorney on the admission that there was evidentiary stuff that they couldn't prove against my client, evidence that hadn't changed in ten years. So there's no reason to suspect that the defense lawyers made this move to avoid trial. There's an enormous amount of evidence suggesting that Mr. Gines didn't commit this crime. But whether or not the motion was made because he was incompetent to stand trial, AOPC caught wind of it after whatever period of time and began demanding while Mr. Gines was still incarcerated in the first five years of this, why isn't this moving forward? It was the Pennsylvania rules of judicial administration that make the leap for us. AOPC is charged with the duty of monitoring the dockets and making recommendations either to the Supreme Court or to the local courts as to how to expedite. They called the local court on several occasions asking what's going on here. Now maybe that call wasn't enough to move anybody because of whatever political or whatever reasons the case wasn't being moved forward, but once that happened and once X number of attempts by AOPC to get the local court administrator to get the case moved didn't happen, Mr. Garner could have walked across the hall to the Chief Justice and said, hey, we've got a guy that's been in jail for five years here, six years here, seven years here, eight years, nine years in custody, and nothing's been done. It's not like they're trying to sharpshoot a judge the first or second time a continuous is granted for a legitimate reason. The continuous was requested for a reason that doesn't square with the law. The judge should have said, listen, I've read Lane. I've read Georgia. ADA doesn't allow us to keep a person. I've read Jackson. We can't keep this person who is mentally unfit for trial in jail forever. And I wanted to clear something else up about the Pennsylvania law that Mr. Petra Gallo got wrong and just plop, plop on it. The Mental Health Act permits trial to be stayed, proceedings to be stayed under the Mental Health Act. But Section D of 7403 reads as follows. Wherein no shall he, the defendant, in any event be detained on a criminal charge longer than a reasonable period of time necessary to determine whether there is a substantial probability that he will attain the capacity in the foreseeable future. If the court determines there is no such probability, it shall discharge the person. Mr. Petra Gallo's argument that he could have been held for ten years is flat wrong. He's represented this entire time. So isn't it really incumbent on counsel to maybe file a mandamus? As opposed to the AOPC telling counsel what they should do? Well, first of all, the counsel, both counsel, both the public defender and private counsel who came on pro bono, both filed Higgy's Corpus motions at first. Secondly, the AOPC was charged with a duty to watch the dockets for something like this. They did so. The only thing they didn't do was do something about it, which is go to the Supreme Court and ask for intervention. They apparently were demanding from the local court administrator, why aren't you moving this case? They stopped short of going to the person who has the power to do something about it, which is the Chief Justice. You didn't answer Judge Restrepo's question. I mean, if you're a lawyer and the trial court is sitting on its hands and not doing its job, isn't Judge Restrepo right that your remedy is to mandamus that charge? You take it off and you say, you know, do something to get this judge off his duff. I don't disagree that there was a failure to many parts of the system. The only part of the system where there was a failure, that is, before this court, is whether or not my client's rights under the ADA were protected. And that is the duty of the AOPC. It is not the duty of the local prosecutor. In some ways you can argue that while it is the duty of the lawyer to do the best for his client that he did, and then failure does show a failure on the part of the system, the ADA didn't put any responsibility on a local public defender to ensure compliance with the ADA. It put that responsibility on the state, and it put that responsibility on the agency of the state that is deemed to have responsibility for ADA compliance within the courts, and that's the AOPC. And that's why sovereign immunity cannot be granted in this case, which is what this appeal is about. This appeal is not about the merits of the case. And if we come back here, I'm very prepared, as you can see by the facts I put in our brief, to argue the merits of the case as well. But it's never going to be about sovereign immunity. It might be about liability and the appropriate assignment of liability, but I think Judge Kearney is right, and I think he did not abuse his discretion when he said this is a fact question for a jury. Now, I'm going to argue when I get the chance that it isn't a fact question. I'm going to argue that it should be a matter of law that AOPC had this duty, that it's enumerated in the rules of judicial administration, and that they fail in that duty. And I'm going to argue, as Judge Kearney in his earlier motion dismissed opinion, that this is essentially an issue of strict liability. It isn't an issue of, you know, Thomas Gard did testify that this is a case that fell through the cracks. I think that some of this they were caught unawares by because it hasn't come up before. But they knew enough to call down to the county and ask them what they were doing, why didn't they know enough to go to the chief judge and say, you've got to do something about this? Let me go back to Judge Hardiman's question about duty. Assuming there is a duty here, when did that duty attach? After a year? After two years? When did the duty attach? The duty attached, the duty was created by the Americans with Disabilities Act in 1990. That duty occurred from the very beginning of the case. Now, as a practical matter, I think what you're asking is when should the AOPC have reacted? I mean, I think if you have it, if they're not properly following Sections 1 and 6 of the rules of judicial administration, Section 505, they would have a system in place to monitor the state of the docket to determine whether there are cases that are falling behind. They obviously have such a system, although in the depositions I took they denied that. But they found out about it somehow. And while within the first five years of this nine-plus-year ordeal, they were on the phone with the local administrator. So they have some system. And when that should kick in, my guess is as soon as there's any allegation in any case that someone is disabled, the AOPC should, first of all, you're asking me to tell them how to run their organization. All I know is they're running their organization in such a way that they do get notice of this. If they need a better system, that's beyond my pay grade. But they knew enough about it to call the county and ask what's going on. They just didn't go the step further and get something done by the power of the Supreme Court. But even if they went to the Supreme Court, even if they had taken the step and gone to the Chief Justice or the court as a whole, it was 100% within the Supreme Court of Pennsylvania's discretion as to what to do with that information, wasn't it? Well, yes, but you have to presume that the Supreme Court. Then you have a causation problem. Maybe you might be right. It might be a liability issue, not a sovereign immunity issue. But I don't know how you can get over a causation hurdle if once the AOPC reports to the Supreme Court, the Supreme Court has complete discretion as to what to do with that information. Well, first of all, I don't know that the Supreme Court has complete discretion.  The law of Pennsylvania, the Mental Health Act says if the determination is made that this person isn't likely to become competent, you must discharge him. So at minimum, the order could have been made to discharge him. Right. You're right. The Supreme Court of Pennsylvania, one would hope, would certainly follow the law. But my point is that the AOPC is powerless to counterman whatever decision the Pennsylvania Supreme Court makes after the AOPC transmits the information. Isn't that right? I didn't understand the question. I'm sorry. Could you ask that again? Sure. Sorry about that. You're quite right that there are constraints on the PA Supreme Court. They don't have absolute discretion in sort of sitting as chancellor in equity. You've got a Mental Health Act that one would hope the Pennsylvania Supreme Court would implement faithfully. But I'm still sort of understanding or challenging you with the notion that you've got a causation problem because if the AOPC had reported back to the Pennsylvania Supreme Court consistent with what 505 says, the AOPC still has no power to counterman whatever decision is made by the Pennsylvania Supreme Court about what to do with that information. Well, first of all, as I said, I believe that the Supreme Court is bound by the law of Pennsylvania, which requires. It's mandatory that he be discharged. So first of all, if the Supreme Court then failed to follow the law of Pennsylvania, we would have a whole new cause of action. We'd have a whole new appeal from their failure to do so. We'd have a whole new cause of action, I should say. That isn't what happened here. I think that it's a question for the jury as to whether or not the AOPC could have done more in failing that duty and whether or not that would have resulted in Mr. Ginesse being relieved of the burden of being incarcerated or held in custody for 10 years. So the causation is whether or not the Supreme Court chose to act, we can't know for sure. But we know the law says that they were required to do so, that they were required to implement the laws of the Commonwealth. Because the AOPC didn't bring it to their attention, there was no chance for them to do that. It certainly shouldn't be up to West Court to determine, first of all, what any of that has to do with sovereign immunity, which is what this appeal is about, nor whether or not a jury would find, as a matter of fact, that nothing would have occurred. We should get a jury instruction in the trial saying the Supreme Court would be required to act according to the law, and the law requires discharge. Let me ask one question, if I may. I think part of the problem is that almost any of us, we've sort of been taught from the time we left law school, that the clerk's office is not really brought into litigation. It's not sued. It's somebody else. But you just don't think of it as it being the clerk's office. And then the concern is, if you hold that the AOPC is not shielded by sovereign immunity, then you have, are we opening the floodgates for suits against it or other clerk's offices, for every type of suit that can't be brought against prosecutors or other actors within the legal system? Judge, we're not talking about the civil clerk of courts here. We're talking about an agency of the Commonwealth which is charged with compliance with a federal statute. That's a different thing than the average filing in a criminal case where the clerk doesn't act as the lawyer, giving advice to the lawyers about what to file and when to file it. Here the Congress imposed a duty on the states and their agencies, according to the statute, to ensure compliance. One of the reasons the Congress did so, and this is from the Lane case, Congress enacted Title II against the backdrop of pervasive, unequal treatment in the administration of state services and programs, including the systematic deprivation of fundamental rights. The reason for the ADA was to stop exactly what happened here. This is different than the average case. It comes with a federal mandate from the ADA placed upon the state, placed upon its agencies, placed upon its courts, including the Supreme Court of the United States or of Pennsylvania. If the next step would have been the Supreme Court ignoring its duty, we would be having a whole different case here. The causation is AOPC had this duty placed upon it by the state. They say so in all of their literature. They admit to it, and they, by the way, admit to undertaking partially ensuring compliance with the ADA. They will admit that they make sure that there's ramps and that there's hearing aids and that there's interpreters. This is also part of this duty that was put upon them in 1990 when the statute was passed. And frankly, the 505 was passed in 1974. So 505 has existed throughout the course of this entire time, including all the while the ADA has been passed. No one was asking to expand the duties of the AOPC. The duty was laid upon them starting in 1974 in the passage of 505 and then in 1990 in the passage of the ADA. That duty existed from the very moment Mr. Ginesse was taken into custody. When they should look into that, how they should look into that, again, Judge, that's above my pay grade. But Congress made it clear you cannot claim you are immune from these claims, state and agencies. You cannot make sovereign immunity claims here. And I'd be happy to litigate this once discovery is completely closed on the issue of whether AOPC has liability. But they could never claim sovereign immunity. The floodgate would open if you allowed an agency in the state to ignore the language of the ADA and say, we want sovereign immunity even though we're an arm of a state that doesn't have it. This is not a case for sovereign immunity. It might be a case, I don't think it's a case to excuse them from their liability either, but that's a trial question. That's a fact question that this court can't answer and Judge Kiernan decided he couldn't answer. And it certainly doesn't abuse his discretion to insist that factual matters be answered by a jury. All right. My colleagues, any further questions? None, thank you. No, thank you. Okay. Mr. Petragallo? Yes, thank you. Briefly, to my learned counsel opponent, I would say be careful about the facts. Much of what I heard was beyond the boundaries of the record in this case. But one thing his theme has been throughout is that this is a case that is whether sovereign immunity bars Genesis' claims that the AOPC discriminated against him in violation of Title II of the ADA and the Due Process Clause. Our prior opinion has said that the ADA and the Due Process Clause apply to the actors in that case and that others can be added by an amended complaint. So why don't you start off with sovereign immunity and then we'll – Sure. I know we all kind of got into the merits, but let's stay away from that for the moment. Please. In Lane, Tennessee and Lane, refining U.S. and Georgia, the court created the three-part test for addressing whether there is a Title II violation that would abrogate sovereign immunity in every case. It's not a blanket that you have to evaluate whether there is truly a Title II violation. So as to – in every case, as to every defendant, and in this case as to the AOPC, whether that Title II violation would abrogate sovereign immunity. That did not happen in the prior opinions. We were not a part of that case. No, but the court did say that the ADA and due process are in play here. We don't disagree. It's just not in play as to the AOPC. You know, you have to have – to fail a duty, you have to have an obligation. And the obligation has to be, I might add, more than, quotes, we could have done – it could have done more. That's not an allegation that equates a violation. This Second Amendment complaint doesn't say what it should have done that would have been a violation of the Title – Article II of the ADA. No, what it says is only is that there was not – that AOPC is responsible for ADA compliance, did not abide by that duty of making sure there was ADA compliance. Plus, it didn't abide by 5051 and 5056. It also mentioned, I think, 50512, but I'll leave that aside. To monitor the dockets and to report to the Supreme Court if there's a problem and to try to make sure that litigation goes through expeditiously. And it didn't happen here, and it didn't happen, the argument is, in violation of the Mental Health Procedures Act, that this person, he just – he either slipped through the cracks or he was intentionally put into the cracks and just left there by a whole host of people, possibly, possibly including the AOPC. Well, that sounds like Mr. Santos speaking, Your Honor, because that's not what's pled in the Second Amendment complaint. Now, this is round two for that complaint after instruction. And what I would say in response to all that is, you know, a duty – in order to have a Title II violation, there has to be some duty that was directly breached that relates to discrimination of this individual. And that's not pled. All right. Mr. Portugal, I think this gets back to what we were trying to get to the bottom of in the beginning, which is someone in the Commonwealth has that duty, right? I mean, we know that the Commonwealth of Pennsylvania must comply with the ADA. Can we agree on that? Yes, indeed. Okay. So that's because the Supreme Court has told us that sovereign immunity was abrogated. So now who in the Commonwealth has the duty to comply with the ADA? Is it the Commonwealth of Pennsylvania, the Department of Mental Health? Is it the – you know, how do we get to the bottom of which party or parties has a duty here? How do we get to the bottom of that? Allow this answer. If the Department of Human Services, at the outset when the first judge suggested he be sent to the mental hospital, accepted him into that mental hospital and kept him there for treatment, treatment which, parenthetically, although Mr. Sanzone says otherwise, may have resulted in him being able to stay in trial. So if that happened, that is the responsibility of the Commonwealth of Pennsylvania through the Department of Human Services. And no duty in that regard asides to the AOPC. So, you know, and again, we'll go back to Lane v. Tennessee or Tennessee v. Lane and say every case is entitled to that three-part test under Georgia. And so here the test is what violation was the AOPC guilty of? If they did everything and they monitored, how could that be nexus with what kept him incarcerated? And, by the way, Pennsylvania has a perfect system to have dealt with Mr. Sanzone. The rules of – I'm sorry. I beg your pardon, Joel. I apologize, Joel. Okay. Mr. Ginesse. And it is the rules of criminal procedure and Rule 600, which entitles you to speeding trial, a motion for trial, a motion for housing under the Mental Health Protection Act, things that the plaintiff's lawyers had completely within their realm. There is lots of fault here, and it lies almost exclusively with those individuals that failed to represent their client well. And we're looking for a way to create a new liability, and I agree. This could be a Pandora's box that opens to greater liabilities and greater opportunities. Mr. Gallo, is it counsel's fault – it's not defense counsel's fault that there weren't sufficient beds so that Ginesse could have gotten the mental health treatment he was entitled to, right? Correct. All right. But I guess you're drawing – and this is where you're drawing a dichotomy. What you're saying is it's not the lawyer's fault that the mental health system let him down, but it is his lawyer's fault that they did not aggressively defend the case, either by seeking a quick and speedy trial or by mandamusing or calcitering judges in Fayette County, et cetera. Is that the point? Yes, sir. And adding to that, you know, the second amended complaint, in paragraphs 28, 30, and 35 – let me just read briefly. This is paragraph 28 of the second amended complaint. The district attorneys, during the period of incarceration, acquiesced to the repeated continuance of the plaintiff's trial every month for approximately three years. Next. The plaintiff, represented by the public defender, Jeffrey Whitecoe – Whitecoe in his capacity as public defender – to have plaintiff's case removed from the trial list despite knowing his incompetency. Thirty-one. Whitecoe had the authority and opportunity to intervene, yet no action was taken. Thirty-five. Whitecoe filed a motion requesting plaintiff's trial be continued until the plaintiff became competent. Mr. Janess's fate was in the hands of his lawyers, and whether it was strategic or otherwise, no conduct of the AOPC has the right to take over the management of that case, nor does the AOPC have the right to tell the Supreme Court, you've got to take over the case. And oh, by the way, the door to the Supreme Court is equally available to the lawyers representing Janess as it would be to the AOPC, a motion for King's bench authority. And you're correct. What would the Supreme Court have done? They would have looked into it and said, well, okay, this is a situation where the delay is exclusively related to judges granting motions for continuance. Period. I appreciate the opportunity to be heard. Thank you very much. Any further questions of my colleagues? None for me. None for me. Thank you. Well-presented arguments, and I would ask that the transcript be prepared of this oral argument and that the cost be split between the parties here. Is that acceptable? Yes, sir. Dr. Gallo speaking. Yes, sir. Yes, Your Honor, for the plaintiff. Okay. Thank you very much. Thank you. And we'll take the matter under advisement and recess for today.